IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| DEREK A. DEBOER | ) | |
| and BROOKE J. DEBOER, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 140027N |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision entered September 8, 2014. The court did not receive a request for an award of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 19.

Plaintiffs appeal Defendant's Notices of Deficiency Assessment for the 2008, 2009, 2010, and 2011 tax years. A trial was held on June 10, 2014, in the Oregon Tax Courtroom in Salem, Oregon. Vanessa Usui, Attorney at Law, appeared on behalf of Plaintiffs. Plaintiff Derek A. DeBoer (DeBoer) and Daniel A. Kosmatka (Kosmatka), Certified Public Accountant (CPA), testified on behalf of Plaintiffs. Peggy Ellis (Ellis), Tax Auditor, appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 through 22 and Defendant's Exhibits A through K, O through U, V pages 1 through 14 and 17, W, and X were received without objection. Plaintiffs objected to page 15 of Defendant's Exhibit V, a picture of the residence on the property, and the court excluded that page of Exhibit V. Following trial, the parties filed written arguments addressing the penalties imposed by Defendant.

/ / /

/ / /

I.  STATEMENT OF FACTS

DeBoer testified that, during the tax years at issue, he worked as a "General Manager" both at a car dealership and also for the farm at issue in this case.  (*See, e.g.*, Ptfs' Ex 5 at 2.) DeBoer testified that Plaintiffs began their farm in 2003 when they purchased a parcel of land (subject property) at auction.  He testified the subject property is divided into three tax lots:  one with a residence, one with open pasture, and one with a holding pond, also referred to by the parties as "the lake."  DeBoer testified that "a ranch business * * * was something that [he] was wanting to get into."  He testified that he started using the name "Rancho Sereno" in 2004 when he set up a separate checking account for the farm and later formed "Rancho Sereno LLC" in July 2006.  (Ptfs' Exs 21, 22.)  DeBoer testified that he wrote a business plan that was "the general idea of what [he] wanted to accomplish" with the farm; he periodically added journal entries to update the business plan.  (*See* Ptfs' Ex 16.)  DeBoer testified that he paid Hawk Consulting as a part-time employee to do "all the ranch stuff that [he] did not know how to do, and learned about."  (*See* Ptfs' Ex 13 at 51, 53-57, 59, 61, 65, 67.)  DeBoer testified that Plaintiffs spent, on average, around 20 to 60 hours a month working on the farm.  DeBoer testified that Plaintiffs engaged in several different activities on the farm.

A.      *The cattle operation*

DeBoer testified that, prior to his purchase of the subject property, Dalton Straus (Straus) leased part of the subject property to run 60 to 75 head of cattle.  He testified Plaintiffs continued that lease with Straus until 2009.  DeBoer testified that Straus paid the costs associated with the irrigation system and provided full-time employees for pest control, weed control, fence maintenance, and irrigation system management.  DeBoer testified that when Straus left, he decided to run cattle on the subject property, but he did not take it to a "full giant scale

operation" due to fluctuating demand for beef. DeBoer testified that Plaintiffs would "eat some of the beef, probably about an eighth of each [cow]. [He'd] keep a little bit, sell the rest." DeBoer testified that he considered "completely abandoning the cattle operation and switching to a haying operation," but the "costs to get into that were extensive" and he "did not see a large scale hay operation being very viable." He testified that he has grown some hay for his own cattle. Ellis testified that during Defendant's site visit on June 1, 2012, she observed approximately 15 head of cattle on the subject property.

B.      *Horse boarding, training, and showing with Pasos con Brio (PCB)*

DeBoer testified that prior to purchasing the subject property he had a relationship with PCB and made a contract with PCB to board their competition and breeding horses, which required construction of a new barn on the subject property. Plaintiffs provided no evidence of the contract. DeBoer testified that he does most of his business on a handshake. He testified that PCB helped with the design and layout of the barn to meet its upscale needs and also gave input on the gate to the subject property, which was installed to "label the property and * * * suggest[] that [it] was a first class horse boarding operation." DeBoer testified that unexpected costs arose during construction of the new barn because the subject property was in a flood plain. He testified that the subject property experienced a "significant flood" in 2006.

DeBoer testified that PCB paid about $150 per stall per month and provided their own feed and care for the horses. He testified that he did not analyze the profitability of boarding horses or the financial return of constructing the new barn. DeBoer testified that, in 2008, Plaintiffs lost PCB as a client and lost another potential client, due to Plaintiffs' inability to put an arena on the subject property. DeBoer testified Plaintiffs did not advertise their horse boarding service when PCB was a client because PCB was willing to pay a premium to be their

sole client. He testified that Plaintiffs did not advertise after they lost PCB because "the economy had taken such a sharp decline, [they] didn't want to do anything that would increase [their] expenses."

Ellis testified that during the site visit on June 1, 2012, DeBoer told her there were three horses on the subject property, Plaintiffs' "working horse" and two other horses belonging to clients. DeBoer testified that Plaintiffs purchased the "working horse" in 2003. (*See* Ptfs' Ex 13 at 6, 8.) He testified that one of his daughters rides Plaintiffs' "working horse" and explained that it would be unreasonable to plan to sell a horse that had not been ridden by anyone else.[1] DeBoer testified that Plaintiffs consulted with Silver Spring Farm in 2012 to select, train, and show an "investment horse." He testified that Plaintiffs made a profit on the "investment horse" by leasing it with an option to purchase that was exercised in 2014.

C.      *Vineyard*

DeBoer testified that, in 2007, he consulted with Don and Traute Moore (Moores) about using the subject property as a vineyard and they referred him to Porter Lombard (Lombard), a wine grape growing expert from Oregon State University's extension program. DeBoer testified that Lombard made a formal soil analysis and site survey of the subject property and expressed concern about frost and the high water table. DeBoer testified that Lombard's analysis

> "went against a lot of what [he] had read or other people that [he] had talked to, where they had talked about wanting high drainage soils and rocky soils, and other vineyards that [he] had visited just in [his] own personal time and that's when [he] really thought [he] would talk to Don and Traute Moore because they had successful vineyards in [the] area."

DeBoer testified that he had worked with the Moores on another site and "they were very excited about [the subject property], they thought there was some promising future there." DeBoer

---

[1] A note affixed to a cost worksheet stated "No plans to resale [sic] working horse for ranch." (Ptfs' Ex 13 at 6.)

testified that with help from the Moores' employee he planted a sample vineyard of six different varietals on the subject property. He testified that the sample pinot noir grapes did very well.

DeBoer testified that the 2013 winter was "one of the harshest winters the Rogue Valley has had" and that, unlike other local grape growers that lost their vineyards, Plaintiffs did not lose their sample vineyard. DeBoer testified that the Moores want to expand the pinot noir grapes to grow enough for a whole barrel, so root stocks have been ordered to put in 250 plants.

D.      *Plaintiffs' personal use of the subject property*

DeBoer testified that Plaintiffs built a personal residence on the subject property in 2009. The parties stipulated that the personal residence is a "nice house." Ellis testified that Plaintiffs' house is within walking distance of the barn and lake. (*See* Def's Ex V at 11 (aerial photo).) Plaintiffs built a boat house on the lake.[2] (*See* Ptfs' Ex 17 at 73 (depreciation schedule).) DeBoer testified that his family enjoys the lake and has used their personal boat for waterskiing on the lake. He testified that the gate at the subject property's entrance is also used to access Plaintiffs' personal residence from Table Rock Road. (*See* Def's Ex V at 17.)

E.      *Plaintiffs' recordkeeping and finances*

DeBoer testified that he separately tracked personal and farm finances using QuickBooks, but he "did not keep receipts [once entered] unless it was for a really large item * * * that [he] might resell someday." (*See* Ptfs' Exs 9-12.) He testified about the source and validity of his claimed farm expenses and provided some receipts and invoices related to the farm.[3] (*See* Ptfs' Ex 13.) Plaintiffs purchased the subject property for $1,048,125 in 2003. (Def's Ex V at 4.) The Jackson County Assessor determined the subject property's 2013-14 real market value to be

_____

[2] Kosmatka testified that Plaintiffs did not claim depreciation for the boat house because it is a personal asset; it was included on the schedule to track basis. (Ptfs' Ex 17 at 73.)

[3] DeBoer conceded at trial that one of the documents presented, Hydrotech Manufacturing LLC proposal, was a personal expense. (*See* Ptfs' Ex 13 at 48.) Kosmatka testified that it was not deducted on the Schedule F.

$2,092,450.[4] (*Id.* at 5-10.) DeBoer testified that he listed the subject property for sale for $17 million in 2012. He testified that a potential client expressed interest in the subject property, but ultimately purchased a different property.

Ellis testified that Plaintiffs reported farm losses on their 2003 through 2012 income tax returns ranging from $58,326 to $170,948, with a cumulative loss of $1,219,428 over all of those years. (Def's Ex J at 1.) DeBoer testified that "there were lots of different pieces" to the farm that he expected to generate revenue, but he "did not do that formal of a breakdown" or analysis when or how it would become profitable. He testified that there were

> "multiple avenues that [Plaintiffs were] working on. It wasn't only the few horses that [PCB] had there. It was the investment horse that was there, the income that would be coming in from the shows that were going to be there, and the training, and the income from Straus and the cows."

DeBoer testified that, during the economic downturn in 2008, he turned his attention back to his work at the car dealership and the farm entered a "preserving stage" that lasted until 2012. He testified that, during the "preserving stage," Plaintiffs "pulled in and tried to really slow expenses, and slow exposure, and try to just find a way to tread water." DeBoer testified that he "can't say that [he] kn[e]w that for sure" the farm would be unprofitable during the tax years at issue because "it was not part of [his] strategy or questioning that [he] went through * * * with [himself]. [The questioning] was, 'how can I keep all this afloat and not lose it?' "

F. *Tax preparation*

DeBoer testified that he is not "strong in accounting, which is why [he has] an expert." Kosmatka testified that he is a CPA and a personal financial specialist and is certified in financial forensics. He testified that, with the assistance of his staff, he prepared, reviewed, and signed all of Plaintiffs' federal and Oregon income tax returns for the years at issue. Kosmatka testified

---

[4] $1,692,630 is allocated to the property tax account including Plaintiffs' residence. (Def's Ex V at 5-6.)

that he also discussed "different business opportunities" with Plaintiffs "to offer [his] insights as to the pros and cons of those types of investments."

Kosmatka testified that, in preparation of filing income tax returns each year, he sent Plaintiffs a "tax organizer" that had the prior year's information including "corresponding income and deductions which assists the client in knowing what types of things [Kosmatka is] looking for." (*See* Ptfs' Exs 17-20 (work papers).) Kosmatka testified that clients

> "take that information, and from their records they assemble the tax information
> as requested. Once it has been assembled, [they] will meet, review those items,
> [he'll] try and scan initially to see if there is anything that [he] think[s] might need
> enhancement or additional clarification. Once [he's] had that completed, then
> [he'll] assign it to a staff person."

Kosmatka testified that another CPA on his staff "goes through the in-depth detail and analyzes the numbers for [him]. And helps [him] then sort out the things that [they] think are properly classified whether it goes to Schedule E, A, or F, or wherever it happens to be." Kosmatka testified that he and his firm "don't expect the client to be a CPA. [They] don't expect them to even be a bookkeeper. [The client's] job is to run their business and do it in a way that helps them have the best opportunity to make a profit."

Kosmatka testified that the handwritten entries on the "Farm Income" pages of the "tax organizer" were prepared by DeBoer based on his QuickBooks ledger, but were not always the amounts claimed on the tax return. (*See, e.g.*, Ptfs' Ex 19 at 33.) Kosmatka testified that after DeBoer completed the "tax organizer" he would "go through the information and analyze it again for those things that [he and DeBoer thought were] farm expenses versus those that [were] nonfarm expenses." Kosmatka testified that, for example, DeBoer's handwritten numbers for insurance, mortgage interest, and taxes on the 2010 tax organizer were reduced to the typed numbers as a result of that review process. (*See* Ptfs' Ex 19 at 33, Ex 7 at 6.) Kosmatka testified

that those changes were made at his direction by a CPA on his staff.  The parties stipulated that the same detailed review procedure occurred for all the years at issue.  DeBoer testified that he was aware that Plaintiffs paid less tax as a result of reporting a loss on the farm.

G.    *Department of Revenue's audit and adjustments*

Ellis testified that, based on Defendant's determination that Plaintiffs' farm was not conducted for profit, it disallowed the deductions taken on Plaintiffs' Schedule F.  (*See* Def's Ex P at 4.)  Defendant increased the property tax deduction on Plaintiffs' Schedule A and limited the deductions from Plaintiffs' farm to the amount of income generated by the farm.  (*Id.* at 19.)  Ellis testified that Defendant was unable to transfer the mortgage interest from Plaintiffs' Schedule F to Schedule A because Plaintiffs had exceeded the amount allowed for the home mortgage interest deduction.  (*See* Def's Ex W at 38.)  Ellis testified that Defendant "was not satisfied with the substantiation being provided [at audit] * * * and [it] did not receive any inquiries back as to what it was unsatisfied with or how that could get resolved by additional documentation" so Defendant added the intent to evade penalty.  (*See* Def's Ex U at 7.)

Ellis testified that Defendant imposed the 100 percent intent to evade penalty because Plaintiffs took large deductions for personal expenses.  She testified Plaintiffs deducted mortgage interest on the subject property and depreciation of assets, including the lake improvements and dam, irrigation equipment, fencing, several barns, the entrance gate, the "working horse," and a boat (SeaDoo) with a ski tower.[5]  (Def's Ex W at 1, 4-5, Ex O; Ptfs' Ex 13 at 1-2.)  Plaintiffs deducted $39,360 in "custom hire" expenses on their 2009 Schedule F, which included expenses

---

[5] DeBoer testified that the SeaDoo was necessary for maintenance of the pumps, the dam, and the lake overall because the SeaDoo could traverse shallow portions of the lake.  He testified that the ski tower was necessary to anchor a rope to pull weeds and debris away from the pumps.

totaling $26,692 that were listed in DeBoer's QuickBooks as "House (New Const)."[6] (Def's Ex Q at 11-12; Ptfs' Ex 6 at 8, Ex 18 at 30.) DeBoer testified that those expenses were to repair flood damage on the subject property. He testified that Plaintiffs took advantage of the cost savings of contractors and equipment already on the subject property to construct the new personal residence. Ellis testified that Plaintiffs deducted $12,251 for utilities on their 2009 Schedule F, which included $6,799 paid to Pacific Power to "Install Utilities." (Ptfs' Ex 6 at 8, Def's Ex Q at 10.) She testified that the corresponding "Single Family Residential" electrical permit was for "limited energy for burglar alarm, tv, speaker wires, & data for the new dwelling." (Def's Ex T at 19.)

Ellis testified that "not one of [Plaintiffs' three largest farm expenses] even by themselves would have been covered by the income generated by [the farm]." (*See* Def's Ex W at 1.) Ellis testified that Plaintiffs received "significant amounts of income from other sources than the farm activity." She testified that, based on Plaintiffs' income tax returns, Plaintiffs' income ranged from $193,732 to $381,038 from 2003 to 2012. (Def's Ex K at 1.)

## I. ANALYSIS

The issues are (1) whether Plaintiffs' farm was a business, for which deductions are allowed under Internal Revenue Code (IRC) section 162, or an activity not engaged in for profit, under IRC section 183; (2) whether Plaintiffs are subject to the 20 percent substantial understatement of income penalty under ORS 314.402; and (3) whether Plaintiffs are subject to the 100 percent intent to evade penalty under either ORS 305.265(13) or ORS 314.400(6).[7]

---

[6] Those expenses are $9,090 (Western Hydro), $1,200 (Bill's Backhoe), $5,824 (Bill's Backhoe) $1,641 (Bill's Backhoe), and $8,937 (Hydro Tech Manufacturing). (Def's Ex Q at 11-12)

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2009. Although the 2007 ORS are applicable for the 2008 and 2009 tax years, there is no material difference between the 2007 and 2009 versions of the ORS sections cited in this Decision.

A.    *Whether Plaintiffs' farm was operated as a for-profit or not-for-profit activity*

"The Oregon Legislature intended to make Oregon personal income tax law identical to the [IRC] for purposes of determining Oregon taxable income, subject to adjustments and modifications specified in Oregon law." *Ellison v. Dept. of Rev.*, TC-MD No 041142D, WL 2414746 at *6 (Sept 23, 2005), citing ORS 316.007.  The legislature adopted, by reference, the federal definition for deductions allowed under IRC section 162 for trade or business expenses and IRC section 212 for nonbusiness expenses incurred in the production of income.

Under IRC section 162(a), a deduction is allowed for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]"  The code and regulations preclude deductions "for expenses incurred in connection with activities which are not engaged in for profit[,]" except as provided in IRC section 183.  Treas Reg § 1.183-2(a).  "[D]eductions are not allowable under section 162 or 212 for activities which are carried on primarily as a sport, hobby, or for recreation." *Id.*  If the activity is not engaged in for profit, expenses may be deducted under IRC section 183 only to the extent of any profits. *Gallo v. Dept. of Rev.* (*Gallo*), TC-MD No 011022F, WL 21675927 at *3 (July 8, 2003).

> "The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case.  Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit.  In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. * * * In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent."

Treas Reg § 1.183-2(a); *Comm'r v. Groetzinger*, 480 US 23, 35, 107 S Ct 980, 94 L Ed 2d 25 (1987) ("to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and the taxpayer's primary purpose for engaging in the activity must be

for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify"). Generally, the taxpayer's characterization of "several undertakings either as a single activity or as separate activities" will be accepted, unless it "appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case." Treas Reg § 1.183-1(d)(1).

"In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination." Treas Reg § 1.183-2(b). The nonexhaustive list of factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort the taxpayer expends; (4) the expectation that the assets may appreciate in value; (5) the taxpayer's success in carrying on similar or dissimilar activities; (6) the history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. *Id.*

Allowable deductions from taxable income are a "matter of legislative grace" and the burden of proof (substantiation) is placed on the individual claiming the deduction. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992) (citations omitted). The burden of proof in the Oregon Tax Court is a preponderance of the evidence and falls upon the party seeking affirmative relief. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

/ / /

DeBoer's characterization of the variety of activities on the subject property (cows, horse boarding, and grapes) as a single activity is accepted by the court. The activities are considered as a single undertaking in order to determine whether Plaintiffs' farm was operated for profit.

1. *Manner in which taxpayer carries on activity*

"The fact that the taxpayer carries on the activity in a businesslike manner * * * may indicate that the activity is engaged in for profit." Treas Reg § 1.183-2(b)(1). Under that factor, the court considers "(1) whether the taxpayer maintained complete and accurate books and records for the activity; (2) whether the taxpayer conducted the activity in a manner substantially similar to those of comparable activities that were profitable; and (3) whether the taxpayer changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability." *Giles v. Comm'r* (*Giles*), 89 TCM (CCH) 770 (2005), 2005 WL 375462 at *7 (US Tax Ct), citing *Engdahl v. Comm'r*, 72 TC 659, 666-67 (1979); Treas Reg § 1.183-2(b)(1).

DeBoer created a separate checking account and QuickBooks ledger for the farm. He did not keep receipts except for large items that he might one day resell. He conceded that some of the receipts provided by Plaintiffs were for personal expenses. (*See, e.g.,* Ptfs' Ex 13 at 48 (proposal from Hydrotech Manufacturing LLC).) Plaintiffs' records for the farm were incomplete and contained inaccuracies.

Plaintiffs tried to conduct "the activity in a manner substantially similar to those of comparable activities that were profitable" by bringing other businesses to the subject property. *Giles*, 2005 WL 375462 at *7. Plaintiffs leased the subject property to others already in business. Straus, who ran cattle on the subject property, managed the irrigation system and paid costs associated with the irrigation system, chemicals, and fertilizers. PCB, a breeder, gave

significant input on the facilities and provided a hired hand to care for the horses. The Moores operated successful vineyards and provided a worker to help plant the sample vineyard on the subject property.

"A written business plan is not required if the 'business plan was evidenced by * * * actions.' " *Betts v. Comm'r* (*Betts*), 100 TCM (CCH) 67 (2010), 2010 WL 2990300 at *5 (US Tax Ct), citing *Phillips v. Comm'r* (*Phillips*), 73 TCM (CCH) 2296 (1997), 1997 WL 105015 at *6 (US Tax Ct). In order to indicate a profit motive, the business plan should include "meaningful financial analysis." *Id.* Plaintiffs' purported business plan was less a plan and more a journal of the farm activity and description of Plaintiffs' relationships; it provided no discussion of how Plaintiffs would make a profit. Plaintiffs' business plan "is not a plan; [it] is merely a statement of what the [] activity did." *Prieto v. Comm'r* (*Prieto*), 82 TCM (CCH) 716 (2001), 2001 WL 1196201 at *7 (US Tax Ct).

Plaintiffs' failure to advertise suggests that Plaintiffs did not operate the farm for profit. DeBoer testified Plaintiffs did not advertise initially because PCB wanted to be Plaintiffs' sole client. However, Plaintiffs did not analyze whether the farm would be financially viable with only one client.[8] DeBoer testified that Plaintiffs did not advertise after PCB left because the economy had declined and they did not want to increase their expenses. DeBoer's explanation reflects his failure to develop a business plan in which potential income equals or exceeds expenses and indicates that the farm was not operated for profit.

Plaintiffs made changes to their operating procedures by investing in a different breed of horse from Silver Spring Farm, raising their own grass-fed cattle, and planting a sample vineyard. Plaintiffs adopted new techniques to ward off flooding and loss of grapes. However,

---

[8] DeBoer projected $12,000 annually from horse boarding. (Ptfs' Ex 16 at 4.) However, the depreciation of the barn alone was more than $12,000 a year. (*See* Ptfs' Ex 5 at 26, Ex 6 at 27, Ex 7 at 25, Ex 8 at 39.)

Plaintiffs did not abandon their unprofitable methods. Plaintiffs' changes have had no impact on the farm's profitability as income has continued to decline. Plaintiffs "failure to improve profitability and unwillingness to abandon the venture under the circumstances only lead us to conclude as a factual matter that they were personally attached to the venture and their 'predominant, primary or principal objective' was not to profit." *Rodriguez v. Comm'r*, 106 TCM (CCH) 333 (2013), 2013 WL 5272771 at *14 (US Tax Ct). Overall, that factor weighs against Plaintiffs.

2.       *Expertise of taxpayer or their advisors*

"The main inquiry is whether petitioner received advice from the experts as to the accepted principles and economics of profitably running a business * * *." *Betts*, 2010 WL 2990300 at *8 (citations omitted). DeBoer consulted Kosmatka for advice on running a farm business. That factor weighs in favor of Plaintiffs.

3.       *Time and effort expended*

Courts have considered whether taxpayers personally completed tasks such as feeding, grooming, and mucking out stalls. *See, e.g.*, *Engdahl v. Comm'r*, 72 TC 659, 662 (1979) (an orthodontist and his wife who spent 35-55 hours per week feeding, grooming, exercising, and breeding horses and mucking out stalls were engaged in their horse breeding activity for profit). "Such actions indicate both that taxpayers are reducing expenses by employing sweat-equity, as well as partaking in the dirtier and less pleasant aspects of a horse operation." *Gallo*, WL 21675927 at *6. "The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity." Treas Reg § 1.183-2(b)(3); *see also Storey v.*

*Comm'r* (*Storey*), 103 TCM (CCH) 1631 (2012), 2012 WL 1409273 at *10 (US Tax Ct) (the fact that petitioner engaged qualified professionals supported her position).

Plaintiffs spent on average 20 to 60 hours a month working on the farm. However, DeBoer testified that during the tax years at issue, the farm was in a "preserving stage" as DeBoer dedicated more of his time to work at the car dealership. DeBoer's testimony indicates that, especially during the tax years at issue, Plaintiffs expended little of their own time and effort working on the farm. On the other hand, Plaintiffs employed qualified professionals, such as Hawk Consulting, to assist with the farm. Overall, that factor is neutral.

4.      *Expectation that assets may increase in value*

Plaintiffs asserted that the subject property is an asset that may increase in value.

> "[T]axpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation."

Treas Reg § 1.183-2(b)(4). However, under the regulations, holding land with the intent to profit from an increase in its value may be a separate activity than the farm activity.

> "Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value."

Treas Reg § 1.183-1(d). "Farming and holding land will be considered a single activity only 'if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land.' " *Betts*, 2010 WL 2990300 at *10, citing Treas Reg § 1.183-1(d)(1). Plaintiffs' deductions taken for the farm far exceeded its income. That factor weighs against Plaintiffs.

5. *Success in carrying on similar or dissimilar activities*

"[A] taxpayer's previous success in similar activities may show that the taxpayer has a profit objective even though the current activity is presently unprofitable. * * * A taxpayer's success in other, unrelated activities also may indicate a profit objective." *Storey*, 2012 WL 1409273 at *14 (citations omitted). No evidence was presented that DeBoer has been successful in similar farm activities or that he has "converted them from unprofitable to profitable enterprises." Treas Reg § 1.189-2(b)(5). That factor weighs against Plaintiffs.

6. *History of income or losses*

> "[W]here losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable * * * may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, * * * such losses would not be an indication that the activity is not engaged in for profit."

Treas Reg § 1.183-2(b)(6).

Plaintiffs have never generated a profit from the farm. They reported farm losses in excess of $90,000 for nine out of 10 years and in excess of $115,000 for six of those years. (Def's Ex J at 1.) With the exception of 2009, Plaintiffs' losses have decreased each year since 2005. DeBoer testified that floods, depressed market conditions, and the unexpected loss of PCB contributed to the substantial farm losses incurred. Those events qualify as unforeseen circumstances. *See Morley v. Comm'r*, 76 TCM (CCH) 363 (1998), 1998 WL 525494 at *6 (US Tax Ct) ("decline in the horse market" and the death of several horses in accidents were unforeseen circumstances); *Phillips*, 1997 WL 105015 at *6 (petitioner's health problems, a car accident, and loss of a foal were unforeseen circumstances). However, those circumstances do not outweigh Plaintiffs' history of significant losses and failure to generate a profit. "While a person may start out with a bona fide expectation of profit, even if it is unreasonable, there is a

time when, in light of the recurring losses, the bona fides of that expectation must cease."

*Prieto*, 2001 WL 1196201 at *6. That factor weighs against Plaintiffs.

7.  *Amount of occasional profits earned*

"An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small."

Treas Reg § 1.183-2(b)(7). Plaintiffs have never generated a profit from the farm. Plaintiffs presented no evidence of the possibility of an occasional substantial profit. That factor weighs against Plaintiffs.

8.  *Financial status of the taxpayers*

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Treas Reg § 1.183-2(b)(8). Plaintiffs received significant income from sources other than the farm and Plaintiffs paid less tax as a result of their farm losses. That factor weighs against Plaintiffs.

9.  *Elements of personal pleasure or recreation*

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Treas Reg § 1.183-2(b)(9). The evidence in this case tends to show that the subject property and farm improvements allowed Plaintiffs to enjoy a pleasant, rural lifestyle. Plaintiffs built a "nice house" on the subject property close to the lake and the horse boarding facilities. Plaintiffs enjoy boating and waterskiing on the lake. Plaintiffs' daughter rides the "working

/ / /

horse," which is housed in the barn. Plaintiffs have consumed some of the beef from the grass-fed cattle. That factor weighs against Plaintiffs.

The sum of the factors indicates that Plaintiffs' farm is not operated for profit.

B.    *Substantial understatement of income*

A 20 percent penalty is imposed on any underpayment of tax attributable to "a substantial understatement of taxable income * * *." ORS 314.402(1). A "substantial understatement of taxable income" occurs when a taxpayer understates his or her income by more than $15,000. ORS 314.402(2)(a). The calculation of the penalty is pursuant to a formula set forth in the applicable administrative rule, OAR 150-314.402(1). The court concludes that the Department of Revenue properly imposed the substantial understatement penalty for each of the tax years at issue in this case because, as adjusted, Plaintiffs understated their income by more than $100,000 for each tax year at issue. (Def's Exs A at 1, B at 1, C at 1, D at 1.) Plaintiffs assert that Defendant "abused its discretion" by declining to waive the substantial understatement penalty. (Ptfs' Post Trial Br at 4.) The court cannot "substitute its own view for the administrator's judgment" when review is statutorily given to Defendant. *Rogue River Pack. v. Dept. of Rev.*, 6 OTR 293, 301 (1976); *see also* ORS 314.402(6). Defendant "correctly imposed the substantial understatement penalty." (Def's Post Trial Br at 8.) The substantial understatement penalties for the 2008, 2009, 2010, and 2011 tax years are upheld.

C.    *Intent to evade income taxes*

Defendant relies on ORS 305.265(13) and ORS 314.400(6)(b) for its authority to impose the intent to evade penalty on Plaintiffs. ORS 305.265(13) states, in part, that "[i]f the return was falsely prepared and filed with intent to evade the tax, a penalty equal to 100 percent of the

deficiency shall be assessed and collected." ORS 314.400(6)(b) imposes a similar penalty in cases where "[a] report or return was falsely prepared and filed with intent to evade the tax[.]"

To interpret a statute, the court's goal is to discern the legislative intent. *PGE v. Bureau of Labor and Industries* (*PGE*), 317 Or 606, 610, 859 P2d 1143 (1993); ORS 174.020. The court must examine the text and context of the statute, consider legislative history, and, if necessary, look to general maxims of statutory construction. *PGE*, 317 Or at 610-11; *State v. Gaines*, 346 Or 160, 164-65, 171-72, 206 P3d 1042 (2009). If a term is not defined by statute, "words of common usage typically should be given their 'plain, natural, and ordinary meaning.' " *PGE*, 317 Or at 611. "If a term has a well-defined legal meaning, however, then we give it that meaning." *In re Nuss*, 335 Or 368, 372, 67 P3d 386 (2003). The court must not "insert what has been omitted, or * * * omit what has been inserted." ORS 174.010.

"Falsely" is an adverb that is defined as "wrongly: incorrectly." *Webster's Third New Int'l Dictionary* (*Webster's*) 819 (unabridged ed 2002). For a tax return to be "falsely prepared," it need only be incorrectly prepared. Because the farm was not operated for profit and Plaintiffs' claimed Schedule F deductions are disallowed, the court concludes that Plaintiffs' income tax returns were "falsely prepared" for each of the tax years at issue.

"Intent" is a noun that is defined in *Webster's* as "the design or purpose to commit any wrongful or criminal act that is the natural and probable consequence of other voluntary acts or conduct." *Webster's* at 1176. Black's Law Dictionary defines "intent" as "[t]he state of mind accompanying an act, esp. a forbidden act. [] While motive is the inducement to do some act, intent is the mental resolution or determination to do it." *Black's Law Dictionary* (9th ed 2009).

Defendant takes the position that, although "the intent to evade penalty may be loosely referred to as a fraud penalty, there is no true fraud or fraudulent intent implied with the

imposition of the intent to evade penalty under Oregon law." (Def's Rebuttal at 2.) However, Defendant's rule describes the penalty imposed under ORS 305.265(13) as a "fraud penalty." OAR 150-305.265(13). The legislative history of ORS 314.400(6) provides guidance as to the legislature's intent. Or Laws 1981, ch 724, § 4. During the Senate Committee on Justice hearing on Senate Bill (SB) 600 (1981), Department of Revenue Audit Division Administrator George Weber (Weber) referred to the penalty as a "civil fraud penalty."[9] (Minutes, Senate Committee on Justice, Mar 31, 1981, p 11.[10]) Senator Wyers (Wyers) and Weber discussed "what a fraudulently filed claim was." (*Id.* at 12.) Weber explained that the Department of Revenue was "looking for unreported income, overstated deductions, credits that have been claimed that the taxpayer is not intitled [*sic*] to and for non filers" and that "any one of those things could occur without there being any intent to evade taxes." (*Id.*) Wyers asked whether "sloppy bookkeeping or poor knowledge of the tax law or poor advice then would not be fraud," and Weber confirmed that Wyers was correct. (*Id.*) Senator Fadeley noted "there has to be an affirmative act of evasion and not just an error to come within the definition of the statute * * *." (*Id.* at p 10.)

Based on relevant definitions of intent, the context provided by OAR 150-305.265(13), and the legislative history of ORS 314.400(6), the court concludes that the "intent to evade" requires a purposeful act or acts and not mere negligence. The court further concludes that "intent to evade" taxes encompasses instances of tax fraud and, therefore, considers tax fraud case law as persuasive authority in applying the "intent to evade" standard.

/ / /

---

[9] "Although a witness's testimony 'say[s] little about the intent of the Oregon Legislative Assembly as a whole,' * * * such testimony, when consistent with the enacting legislators' own acts and comments, can provide some insight into legislative intent." *State ex rel OHSU v. Haas*, 325 Or 492, 508, 942 P2d 261, 270 (1997) (citation omitted).

[10] The Minutes were prepared by Kathy Eckland, Committee Assistant.

"Fraud is never presumed." *Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950). Recognizing that taxpayers seldom confess tax fraud, the courts have "inferred intent from various kinds of circumstantial evidence." *Bradford v. Comm'r* (*Bradford*), 796 F2d 303, 307 (9th Cir 1986). Courts have "developed a non-exhaustive list of the 'badges of fraud.' " *Kramer v. Comm'r*, 72 TCM (CCH) 1270 at 48-49 (1996), 1996 WL 667434 at *15 (US Tax Ct), citing *Bradford*, 796 F2d at 307. The "badges of fraud" include understatement of income, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealing assets, and failure to cooperate with tax authorities. *Bradford*, 796 F2d at 307 (internal citations omitted). "The whole record is to be searched for evidence of the intent to defraud." *Marinzulich v. Comm'r*, 31 TC 487, 492 (1958). "[T]he presence of badges of fraud will not automatically negate an alternative explanation for [Plaintiffs'] actions." *Medieval Attractions N.V. v. Comm'r*, 72 TCM (CCH) 924 (1996), 1996 WL 583322 at *58 (US Tax Ct) (citation omitted).

Both DeBoer and Kosmatka testified under oath that Plaintiffs did not intend to evade tax, so "the burden of proof going forward shifts to Defendant." *Hansen v. Dept. of Rev.*, TC-MD 130387D, WL 2195546 at *6 (May 27, 2014). The court must find that Plaintiffs intended to evade the tax for each tax year at issue in order for the corresponding penalty to be upheld. *See, e.g.*, *Castillo v. Comm'r*, 84 TC 405, 409 (1985) ("respondent must show that some part of an underpayment was due to fraud for each taxable year for the corresponding addition to tax to be upheld").

Ellis testified that Plaintiffs deducted a significant number of personal expenses that they characterized as business expenses on their Schedule F; specifically, the lake improvements and dam, the driveway to the residence, the entrance gate, the farm home double-wide, fencing, and

mortgage interest on the subject property. Ellis testified that Plaintiffs would not otherwise have been able to deduct mortgage interest on the subject property. She noted that DeBoer did not plausibly explain how the farm could ever make a profit. Ellis testified that Plaintiffs did not adequately cooperate or produce records during the audit process.

That evidence is insufficient to support a conclusion that Plaintiffs filed their 2008, 2010, or 2011 income tax returns with the intent to evade tax. The court has concluded that Plaintiffs are not entitled to any Schedule F deductions for those tax years. However, the court is persuaded that Plaintiffs believed they operated the farm for profit and took deductions in accordance with that bona fide belief. Plaintiffs may have been negligent in both their belief and their recordkeeping, but the court finds no evidence that Plaintiffs acted deceitfully or attempted to conceal the nature of their claimed expenses in the 2008, 2010, or 2011 tax years.

With respect to the 2009 tax year, the court finds some evidence that Plaintiffs may have purposely misclassified personal expenses as business expenses. Plaintiffs constructed a house on the subject property in 2009. DeBoer created a separate QuickBooks category for personal expenses associated with the new house, yet reported some of those expenses on the 2009 "Farm Income Organizer." Plaintiffs deducted an $8,937.50 payment to Hydrotech Manufacturing and three payments to Bill's Backhoe totaling $8,665, all classified as personal expenses in DeBoer's QuickBooks ledger. (Ptfs' Ex 13 at 44-48; Ex 18 at 30; Def's Ex Q at 1, 11-12.) DeBoer conceded at trial that the payment to Hydrotech Manufacturing was personal in nature. With respect to the payments to Bill's Backhoe, he testified that contractors were already on the subject property to work on the house, so Plaintiffs utilized their services to repair flood damage. Despite DeBoer's explanation, the expenses deducted included the cost of equipment delivery and pickup. (Ptfs' Ex 13 at 44-46.) The court finds no substantiation for DeBoer's testimony

that the payments to Bill's Backhoe were related to the farm rather than construction of the new house. The court finds that a claimed payment of $6,799 to install utilities was a personal expense related to the house based on the "Single Family Residential" electrical permit for "limited energy for burglar alarm, tv, speaker wires, & data for the new dwelling." (Def's Ex Q at 10, Ex T at 17, 19.)

The fact that Plaintiffs deducted expenses that were incurred to construct their home, some of which DeBoer classified as personal in his QuickBooks ledger, creates an inference that Plaintiffs intended to evade their taxes in 2009. Plaintiffs respond that they relied in good faith on Kosmatka, a CPA, to advise them and prepare their income tax returns. "Good faith reliance on the advice of a tax professional" may rebut a charge of intent to evade, but only if the taxpayer "made full disclosure of all relevant information to that professional." *U.S. v. Bishop*, 291 F3d 1100, 1106-07 (9th Cir 2002); *see also U.S. v. Boyle*, 469 US 241, 251 (1985) ("When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice").

Kosmatka described his firm's extensive review process with its clients in preparation of filing the client's tax returns. He demonstrated that changes occurred to Plaintiffs' tax returns as a result of that review process and the numbers in the tax organizers were not always the same as the numbers on the tax returns. A handwritten note in Plaintiffs' 2008 tax organizer indicates that DeBoer discussed the tax consequences of Plaintiffs' new house with Kosmatka. (Ptfs' Ex 17 at 72 (note stating "Dan – how do we deal with the removal of the old house and building of the new one?"). The court finds that Plaintiffs provided Kosmatka with all relevant information and relied on his advice as to the deductibility of expenses in 2009. The court concludes that Plaintiffs did not file their 2009 Oregon income tax return with the intent to evade tax.

III. CONCLUSION

After careful consideration, the court concludes Plaintiffs did not operate their farm for profit during any of the tax years at issue. The court further concludes Defendant correctly imposed the substantial understatement penalty under ORS 314.402 for the tax years at issue. The court concludes Plaintiffs are not subject to the intent to evade penalty under either ORS 305.265(13) or ORS 314.400(6) for the tax years at issue. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs did not operate their farm for profit during the 2008 through 2011 tax years.

IT IS FURTHER DECIDED that Defendant correctly imposed the substantial understatement penalty under ORS 314.402 for the 2008 through 2011 tax years.

IT IS FURTHER DECIDED that Plaintiffs are not subject to the intent to evade penalty under either ORS 305.265(13) or ORS 314.400(6) for the 2008 through 2011 tax years.

Dated this ___ day of September 2014.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on September 25, 2014. The court filed and entered this document on September 25, 2014.*